## COMPTROLLER OF THE TREASURY OF THE STATE OF MARYLAND *v.* PANITZ

[No. 82, September Term, 1972.]

*Decided December 7, 1972.*

The cause was argued before MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Jon F. Oster, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Estelle A. Fishbein, Assistant Attorney General,* on the brief, for appellant.

*Alan J. Goldstein* for appellee.

SMITH, J., delivered the opinion of the Court.

There is nothing new about revolution, nor about young people who seek different ways of expressing themselves and of demonstrating their independence from their elders and the thoughts and ideas of their elders. Feeling the need to so express themselves, even at the risk of revealing their own immaturity, certain of the student body of the University of Maryland brought out their May, 1971, *Argus,* a publication described on its title page as "[T]he student feature magazine of the University of Maryland," as a "special non-pornographic issue." Printed as an insert was the November, 1970, issue

which included its "first annual Argus National creative pornography competition." This had been the subject of prior litigation.[1] When payment for its publication was not forthcoming, appellee, Paul Panitz, sued Louis L. Goldstein "individually and as Comptroller of the State

---

1. The litigation was in the United States District Court for the District of Maryland in an action brought by David E. Bourdon (editor-in-chief of Argus) et al. against Louis L. Goldstein et al., # 70-1477 Civil, seeking, as Chief Judge Northrop put it, a "mandatory injunction against the State of Maryland to pay for the publication of the November [1970] issue of Argus." According to Judge Northrop the printer to whom it was submitted "ultimately refused to print same saying that he had received information . . . that the material submitted was hard core pornography." In his unpublished opinion Judge Northrop said in part:

"Subsequent to [a hearing on May 14, 1971], Mr. Bourdon and friends exercising their usual respect for authority and the courts of this nation procured a printer and published the so-called pornographic issue of November, the Magazine Argus, and placed it in the center of the spring Argus and procured the printing of some 12,000 copies, which they are now circulating on the campus.

"The Court feels that by their self-help they have hoisted themselves, or flaunted the processes of this court, have indicated contempt for it, and have certainly deprived —and have no jurisdictional standing inasmuch as their freedom of speech has been exercised despite the fact that they were litigating the same in this court.

"One of the objectives of the Plaintiffs was to seek a declaratory judgment in reference to the censorship of this small minority group who runs Argus Magazine and self-perpetuates itself from year to year by the University, and, of course, the Court cannot make a declaration in that connection because there is no controversy now before this Court. So, protective relief in that cannot be granted.

\* \* \*

"The issue that was originally presented before this Court is not whether the University of Maryland could prohibit entirely the independent expression of student opinion on campus, but to what degree the school administration could oversee the publication of that work, especially when, as here, the publication of the magazine could subject the governing body of the university to criminal sanctions if the contents were adjudged to be obscene, or in any other matter to libel, or to other criminal restrictions or criminal sanctions.

"It seems to this Court to be absurd to permit and to allow and to force the university officials to disburse public funds so that one may exert his First Amendment rights on the campus, and the Court is aware that some Courts have held so, but the Court certainly doesn't think they are reasonable decisions in any respect whatsoever.

"So, under the circumstances, the Court will dismiss this suit."

of Maryland" for his printing bill. The declaration was in assumpsit. After setting forth five common counts it states in the sixth count after first having claimed in that count in conventional form "on accounts stated between them":

"And for that the University of Maryland in College Park, Maryland, a state agency by and through its authorized representative, Clayton R. Plummer, acting in the course of his employment, did on or about May 18, 1971, order goods and services from the Plaintiff, Paul Panitz, in the amount of Seven Thousand Forty Three and no/100ths Dollars as shown on the copy of the Purchase Order attached hereto; that Clayton R. Plummer, the Director of Purchasing at said University of Maryland did forward a copy of voucher in the proper amount to the Defendant after delivery of the ordered goods and services, and the Defendant has failed and refused to pay the same although demand has been duly made for payment thereof."

From the resulting judgment in favor of the plaintiff, later amended to dismiss Louis L. Goldstein as an individual, the Comptroller appeals. Under the authority of Maryland Rule 871 a we shall remand the case without affirmance or reversal for further proceedings.

The Comptroller in his brief gave an explanation of the relationship of the University and the magazine:

"Every full-time undergraduate student at the University of Maryland is required to pay a student activities fee. These fees are deposited in a fund administered by the student government association which makes allocations to various student organizations one of which is *Argus*, the official student feature magazine of the University. *Argus* relies partially upon advertising and sales for its publication costs and the student activities fee provides funds to make

up any difference between the sales and advertising revenue and the total cost of the publication."

This case seems to have proceeded upon the premise that the Comptroller is the custodian of the funds of the University and that, therefore, he is the party who should be sued for the University's contracts. He is not the custodian of its funds. Article VI, § 2 of the Constitution of Maryland provides for the collection of all taxes and revenues by the Comptroller and for him "or such of his deputies as may be authorized to do so by the Legislature" to "grant . . . all warrants for money to be paid out of the Treasury . . . and [to] countersign all checks drawn by the Treasurer . . . ." Section 3 of Article VI, however, provides that "[t]he Treasurer shall receive the moneys of the State" and "disburse the same for the purposes of the State according to law, upon warrants drawn by the Comptroller or his duly authorized deputy, and on checks countersigned by the Comptroller, or his duly authorized deputy, and not otherwise." *See also* Code (1957, 1968 Repl. Vol.) Art. 15A, § 1.

Code (1969 Repl. Vol.) Art. 77A, § 15(e) (2) provides relative to the University:

"All income of the University shall be deposited in the State treasury, or deposited as that office may direct. Any surplus over the estimated receipts in any fiscal year from student income (except the student activities fee, the athletic fee, and the special fee for student projects), for the schools at College Park and Princess Anne, and the professional schools in Baltimore, and the income from the University Hospital, or the State appropriation for these purposes, shall be available to and expended by the University only if and as it secures the written approval of the Board of Public Works."

The defense in this case was that the parties did not mutually assent to the formation of a contract. Without

becoming involved in the propriety of a suit in contract against the Comptroller, *cf. Stanley v. Mellor,* 168 Md. 465, 468, 178 A. 106 (1935), *Bd. of Education v. Alcrymat Corp.,* 258 Md. 508, 516, 266 A. 2d 349 (1970), and *State v. Ambrose,* 191 Md. 353, 369, 62 A. 2d 359 (1948), it is obvious that the Comptroller can in no way be bound under this contract to which he was not a party.

The powers of the University of Maryland are set forth in what is now Code (1969 Repl. Vol.) Art. 77A, § 15 (c). They include all of the powers previously enjoyed by the Maryland State College of Agriculture and the University of Maryland under Chapter 372 of the Acts of 1916 and Chapter 159 of the Acts of 1812, as the latter was amended and supplemented by Chapter 88 of the Acts of 1882, respectively.[2] They were the subject of discussion in *University of Maryland v. Maas,* 173 Md. 554, 197 A. 123 (1938). There our predecessors reversed a judgment recovered against the University for breach of contract in connection with the construction of a dormitory at College Park in 1934, stating that "[t]he plaintiffs, while asserting that . . . funds were available to pay their claim, offered no evidence to substantiate their contentions and it [might] be inferred that the entire fund appropriated ha[d] long since been expended

2. It may come as a shock to the young editors of Argus, although undoubtedly not as great as the shock they wished to give their elders, to learn that the first University of Maryland was not their institution. See St. John's College v. State, 15 Md. 330 (1860), an example of consent by the General Assembly to judicial determination of a controversy involving the State and whether it had made a contract. It is there recited that Washington College, chartered by Chapter 8 of the Acts of 1782, and St. John's College, chartered by Chapter 37 of the Acts of 1784, were by § 33 of the latter act declared (as put in the summation of the State's answer at 341 of 15 Md.) "one university by the name of the University of Maryland, whereof the Governor of the State for the time being should be Chancellor, and the principal of one of said colleges should be Vice-Chancellor." As the resume of the argument on behalf of the State puts it at 369 of 15 Md., the origins of the present University came when "[i]n 1812 the State, as if she had abandoned all hope of any beneficial results from a university by the union of St. John's and Washington Colleges, established a new university of Maryland, to be erected in the City of Baltimore, an institution about as barren of results even as St. John's College itself."

in the construction of the proposed building." Accordingly, recovery was not permitted.

Maryland Rule 871 a permits us where it appears "that the purposes of justice will be advanced by permitting further proceedings in the cause, either through amendment of the pleadings, introduction of additional evidence, making of additional parties, or otherwise" to "order the case to be remanded to the lower court" in lieu "of entering a final order affirming, reversing or modifying the judgment from which the appeal was taken." Judge Oppenheimer was careful to point out for the Court in *Earl v. Anchor Pontiac,* 246 Md. 653, 659, 229 A. 2d 412 (1967), that this rule "is not to be regarded as a general antidote for the errors of counsel." We believe the ends of justice would be best served here by a remand under this rule. It appears that student funds in the nature of activities fees were to be the source of payment. It does not clearly appear that there are now funds available. In fact, answers to interrogatories in the proceeding would give rise to the inference that payment was originally intended to come both from student funds as well as from sales of this issue of *Argus* and that its student promoters might have been a bit unduly optimistic in their estimates of the revenues which would flow from those sales.

Upon the remand plaintiff should be permitted to amend his pleadings so that his suit is against the University. Under the holding in *Maas* before there can then be a recovery it will be necessary for it to be established that there are funds available for payment which are not allocated for other purposes.

> *Remanded without affirmance or reversal for further proceedings not inconsistent with this opinion; costs to abide the final result.*